IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KENNETH W.,                                )
                                           )
                    Plaintiff,             )
                                           )
         v.                                )        1:24CV862
                                           )
FRANK BISIGNANO,[1]                        )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kenneth W. ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of

the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial

review of the Commissioner of Social Security's final decision denying his claim for

Supplemental Security Income ("SSI") under Title XVI of the Act. The parties filed cross-

motions for judgment, and the administrative record has been certified to the Court for review.

I.     PROCEDURAL HISTORY

Plaintiff is a homeless veteran and was previously determined to be disabled in a prior

ALJ decision dated June 17, 2015. (Tr. at 85-91.)[2] However, his SSI benefits were suspended

when he convicted and sentenced to a term of imprisonment. See 42 U.S.C. § 402(x)(1)(A)(i)

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

(prohibiting payment of monthly benefits to beneficiary "confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of a criminal offense"). Because he was incarcerated for over 12 months, his benefits were terminated.[3] Shortly before his release, he protectively filed a new application for SSI on December 7, 2021, alleging a disability onset date of January 1, 2020. (Tr. at 10, 111-12.) His new application was denied initially (Tr. at 92-98, 113-17) and upon reconsideration (Tr. at 99-110, 113-17, 138-40), based on the conclusion that there was insufficient evidence to make a determination. Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 168.) Plaintiff, along with his attorney, attended the subsequent telephonic hearing on June 22, 2023, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 10, 37-79.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 23-24.) The Appeals Council denied Plaintiff's request for review on August 15, 2024, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144

---

[3] Ordinarily, if payments are suspended, they will be resumed "effective with the earliest day of the month in which a recipient is no longer a resident of a public institution." 20 C.F.R. § 416.1325(b). However, benefits will be terminated "following 12 consecutive months of benefit suspension for any reason." 20 C.F.R. § 416.1335. "Thus, when an individual is incarcerated for a period of more than twelve months, her SSI benefits will be terminated regardless of the presence or absence of medical improvement in her impairment(s)." Brennan v. Astrue, 501 F. Supp. 2d 1303, 1309 (D. Kan. 2007). Therefore, Plaintiff here filed a new application for benefits, and the ALJ applied the five-step evaluation process described above.

Case 1:24-cv-00862-JEP    Document 14    Filed 03/31/26    Page 2 of 20

(4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[4] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." <u>Id.</u> at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." <u>Hines</u>, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<i>e.g.</i>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

## III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date.  Plaintiff therefore met his burden at step one of the sequential evaluation process.  (Tr. at 12.)  At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> [C]oronary artery disease; atherosclerosis; obesity; cervicalgia; degenerative disc disease with history of cervical and lumbar spine fracture; Barrett's esophagitis; bipolar disorder; and alcohol use disorder, in remission[.]

(Tr. at 12.)  At step three of the analysis, the ALJ found that none of these impairments, individually or in combination, met or equaled a disability listing.  (Tr. at 14-16.)  Therefore, the ALJ assessed Plaintiff's RFC and determined that, despite his impairments, Plaintiff was able to perform medium exertional level work.  (Tr. at 16.)  In addition, the ALJ found Plaintiff capable of understanding, remembering, and carrying out simple and routine tasks.  (Tr. at 16.)  Notably, the RFC included no other restrictions.

At step four of the sequential analysis, the ALJ found that Plaintiff had no past relevant work.  (Tr. at 22.)  However, the ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 22-23.)  Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 23-24.)

Plaintiff now contends that the ALJ erred by failing to include the need for a cane among Plaintiff's RFC limitations.  Use of a "hand-held assistive device (such as a cane)" may "limit[] the use of ... upper extremities." 20 C.F.R. Part 404, Subpt. P, App'x 1,

6

§ 1.00(C)(6)(d). Accordingly, an ALJ must consider the impact of a "medically required" hand-held assistive device on a claimant's RFC. See McLaughlin v. Colvin, No. 1:12CV621, 2014 WL 12573323, at *2 (M.D.N.C. July 25, 2014); Social Security Ruling 96-6p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work— Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p"). SSR 96-9p explains the impact of an assistive device on an RFC for sedentary work, and courts within this Circuit have applied this ruling to other exertional levels as well. See, e.g., Snider v. Saul, No. 1:18CV549, 2019 WL 4538559, at *3 n.5 (M.D.N.C. Sep. 19, 2019) (collecting cases); Timmons v. Colvin, No. 3:12CV609, 2013 WL 4775131, at *8 (W.D.N.C. Sep. 5, 2013). SSR 96-9p provides the following guidance:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The [ALJ] must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7. Notably, the vocational expert in the present case testified that cane usage "would not be compatible" with the medium work identified in Plaintiff's RFC assessment. (Tr. at 78.)

In considering Plaintiff's contentions, the Court notes first that, as mentioned at the outset, Plaintiff was previously determined to be disabled in a prior administrative decision dated June 2015. In that 2015 decision, the ALJ identified the following severe impairments:

> degenerative disk disease with history of cervical and lumbar spine fracture; hepatitis C with cirrhosis; affective disorders; and personality disorders.

(Tr. at 87.)  As a result of these impairments, the ALJ in the 2015 decision found that Plaintiff was limited to light work (as opposed to the medium work identified in the present 2023 decision) with the following, additional restrictions:

> [Plaintiff] requires a position where he can alternate sitting/standing at will throughout the workday without going off task; he can occasionally climb ramps/stairs; he may never climb ladders, ropes or scaffolds; he can occasionally stoop, kneel, crouch[,] and balance; he requires a handheld device in his left hand for prolonged ambulation and for walking on uneven terrain; and he must avoid concentrate exposure to operational control of moving machinery and working at unprotected heights.  Mentally, he is limited to simple, routine, repetitive tasks in a low-stress tasks in a low-stress setting with no fast production rate or pace work, with occasional interaction with the public[.  H]e can be around co-workers throughout the workday, but [can have] only occasional interaction with coworkers and he can respond appropriately to supervision.  Due to a combination of mental and physical issues, and pain, he would be off-task 10 percent of the workday, in addition to regular breaks, and due to symptoms, he would miss work greater than 10 percent [of the time].

(Tr. at 87 (emphasis added).)  Thus, that 2015 decision included the use of a hand-held assistive device among Plaintiff's many RFC restrictions.  As a result of those limitations, the ALJ in the 2015 decision concluded that Plaintiff was disabled. (Tr. at 91.)

In the present 2023 decision, the ALJ likewise found that Plaintiff's severe impairments included "degenerative disc disease with history of cervical and lumbar spine fracture."  (Tr. at 12.)  Notably, the spinal fractures occurred in 2002 when Plaintiff fell through the roof of a building, and were thus remote in time even at the time of the 2015 decision.  (Tr. at 57, 634.)  The 2015 decision reflects that Plaintiff "has been using a cane since 2002 and uses it to stabilize himself when standing/walking" and "the cane was prescribed by Chip Cooper at Downtown Health Plaza."  (Tr. at 89.)  Similarly, in the present case, Plaintiff reported that he

8

had used a cane "[s]ince 2002 when [he] broke the L4 and L5 in my lower spine" and that he used the cane any time he left his building. (Tr. at 49.) The ALJ in the 2015 decision accepted Plaintiff's need for a cane for prolonged ambulation. As noted above, that favorable disability period ended due to incarceration lasting longer than 12 months rather than due to a finding of medical improvement. (See Tr. at 200.) In addition, the medical record reflects that during his time in prison, Plaintiff was medically approved to have a cane for walking, along with an assignment to a bottom bunk and a back brace, and that medical approval for the cane extended through his release from prison in March 2022. (Tr. at 58, 696.) The medical records from the correctional facility reflect that Plaintiff regularly had his cane to assist with ambulation and was observed walking with his cane on his way to appointments and/or exhibiting a shuffling gait and rigid posture. (Tr. at 634, 641, 649, 665, 666, 668, 672, 676, 678, 682, 693.)

The ALJ in the present decision did provide some explanation for departing from the prior ALJ's findings regarding cane usage, but she provided little to account for increasing Plaintiff's RFC from light to medium exertional level work or for omitting the bulk of Plaintiff's other physical and mental limitations, including his need for a cane for prolonged ambulation. As explained by another district court considering a similar termination of benefits:

> When an individual is receiving SSI, the Commissioner will conduct periodic reviews to determine whether that individual continues to meet the requirements of the law. 20 C.F.R. § 416.990. In conducting continuing disability reviews for SSI benefits, the Commissioner applies a seven-step sequential evaluation process to determine whether there has been medical improvement in the individual's impairment(s) that is related to ability to do work. 20 C.F.R. § 416.994. This is often called applying the "medical improvement" standard.

Apart from the "medical improvement" standard, however, there are various reasons individuals may not be eligible for SSI benefits for which they would be otherwise eligible. 20 C.F.R. §§ 416.207–15. In passing Title XVI of the Act, Congress excluded from eligibility for SSI benefits "anyone who is an 'inmate in a public institution.'" Schweiker v. Wilson, 450 U.S. 221, 224, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)(quoting 42 U.S.C. § 1382(e)(1)(A)). An "inmate in a public institution" includes individuals incarcerated in jail or prison. Wilson, 450 U.S. at 232, 101 S.Ct. 1074 . . . . The Commissioner has promulgated regulations implementing the Act and providing that residents of public institutions may not receive SSI benefits. 20 C.F.R. § 416.211.

The regulations provide that payment of SSI benefits may be suspended or terminated in certain circumstances. 20 C.F.R. §§ 416.1320–40. Payment of SSI benefits is suspended effective with the first full month an individual is a resident of a public institution. 20 C.F.R. § 416.1325. Benefits for which payments have been suspended will be resumed "effective with the earliest day of the month in which a recipient is no longer a resident of a public institution." 20 C.F.R. § 416.1325(b). However, benefits will be terminated "following 12 consecutive months of benefit suspension for any reason . . . effective with the start of the 13th month after the suspension began." 20 C.F.R. § 416.1335.

Thus, when an individual is incarcerated for a period of more than twelve months, her SSI benefits will be terminated regardless of the presence or absence of medical improvement in her impairment(s). That is what happened here. Plaintiff's benefits were terminated when they had been suspended for twelve consecutive months of incarceration. When plaintiff was released from prison, her benefits could not be resumed because they had been terminated. Therefore, plaintiff made a new application for SSI benefits. Because this case involved a new application rather than a continuing disability review, the ALJ applied the five-step sequential evaluation process provided in 20 C.F.R. § 416.920 rather than the seven-step medical improvement standard provided in 20 C.F.R. § 416.994 for continuing disability reviews. . . . .

The regulations provide that the Commissioner has the responsibility to develop a claimant's "complete medical history for at least the 12 months preceding the month in which [the claimant filed her] application unless there is a reason to believe that development of an earlier period is necessary." 20 C.F.R. § 416.912 (emphasis added). As plaintiff argues, medical evidence and opinions from the earlier adjudicated period are relevant to plaintiff's medical history and should be considered. . . . The ALJ discussed these records extensively in his opinion, . . . but found that they were irrelevant to the "current application" and stated they were noted in the decision only for historical perspective. . . . Moreover, there is no indication in the record or the decision

that the ALJ ever provided the records to Dr. Golon or sought an update to the medical expert's opinions in light of the new exhibits. . . .

Although the agency was correct to require plaintiff to complete a new application for SSI after her release from prison, and although the ALJ was correct not to apply the medical improvement standard of review, the Commissioner had found that plaintiff was disabled because of mental impairments from Apr. 21, 1992 at least until her benefits were terminated in 1998 due to twelve months continuous suspension because of incarceration. . . . In the circumstances of this case development of the record regarding the earlier period is necessary to understand the progression of plaintiff's impairments. . . .

The decision reveals that, although the ALJ reviewed some of the records regarding the prior period, he erroneously found them irrelevant to the current application. Apparently because he found the records irrelevant to the current application, the ALJ did not provide the record to Drs. Golon, Ohlde, or Khanna, and did not seek an updated opinion based upon the physicians' review of the evidence in its entirety. Therefore, remand is necessary for the Commissioner to properly develop the record regarding the prior period and seek expert medical advice regarding plaintiff's current limitations in light of the record in toto. If the Commissioner determines that plaintiff is not disabled, then he must explain why he found the claimant not disabled when the claimant had previously been found to be disabled. Although the court recognizes that there are perfectly legitimate and reasonable reasons for denying benefits at a later date when benefits were awarded earlier, those reasons must be set forth by the Commissioner in his decision in order for this court to engage in meaningful judicial review. The court does not imply that the medical improvement standard must be applied in circumstances such as this, merely that the decision must include an explanation of the basis from which one might conclude that plaintiff is not presently disabled although she was earlier determined to be disabled. Relevant to that inquiry will be an evaluation of the longitudinal progression of plaintiff's condition including evaluation of the medical records and opinions produced before plaintiff was incarcerated, medical evidence and medical opinions relating to plaintiff's condition and treatment while she was incarcerated, and medical evidence and opinions relating to plaintiff's condition and treatment after she was released from incarceration.

Brennan v. Astrue, 501 F. Supp. 2d 1303, 1308-11 (D. Kan. 2007).

The Court of Appeals for the Fourth Circuit has adopted a similar rule, although not

specifically in the context of terminated benefits due to incarceration. See Lively v. Sec. of

11

Health & Human Servs., 820 F.2d 1391, 1392 (4th Cir. 1987) (noting that res judicata applies to Social Security disability cases and "prevents reappraisal of both the Secretary's findings and his decision in Social Security cases that have become final"); Albright v. Comm'r of Soc. Sec., 174 F.3d 473, 477-78 (4th Cir. 1999) ("To have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large—that final agency adjudications should carry considerable weight."). In Albright, the Fourth Circuit explained that

> the result in Lively is . . . best understood as a practical illustration of the substantial evidence rule. In other words, we determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.

Albright, 174 F.3d at 477-78.

These decisions are reflected in Acquiescence Ruling 00-1(4), which provides that "where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period." Acquiescence Ruling 00-1(4), (Interpreting *Lively v. Secretary of Health and Human Services*)—Effect of Prior Disability Findings on Adjudication of a Subsequent Disability Claim—Titles II and XVI of the Social Security Act, 65 Fed. Reg. 1936, 1938, 2000 WL 43774, at *4 (Jan. 12, 2000). The Social Security Administration issued Acquiescence Ruling 00-1(4) following the Lively and Albright decisions, promulgating the procedure an adjudicator must follow when there is a final decision by the ALJ or Appeals Council in a prior disability claim:

When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based on subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

AR 00-1(4), 2000 WL 43774, at *4.

In the present 2023 decision, the ALJ acknowledged this obligation, and the ALJ found as follows:

Pursuant to the Albright Acquiescence Ruling (AR 00-1(4)), the undersigned finds that [Plaintiff's RFC] has changed with the passage of time, and that the previously adjudicated period was not close in time to the period of adjudication before the undersigned. Accordingly, the undersigned finds that the [RFC] in the [2015 decision] is not consistent [with] or supported by the current record. Evidence at the hearing level . . . reflects no sensory or motor deficits, no abnormalities of [Plaintiff's] postures, and no feelings of instability. On multiple instances, [Plaintiff] was ambulating without assistance and there was no evidence of gait disturbance.

(Tr. at 22) (internal citations omitted). Specifically, in finding that the record did not support cane use as a medical necessity, the ALJ relied on treatment records from "April 2022, October 2022, January 2023, February 2023, and June 2023," all of which the ALJ found "note[d] that [Plaintiff] was ambulating without assistance" and showed "no evidence of gait disturbance." (Tr. at 21) (citing Tr. at 860, 893, 930, 1007, 1077).

Plaintiff, in turn, argues that the "[t]he ALJ's entire premise seems to be built upon a handful of cherrypicked examples from doctors treating [Plaintiff] for ailments unrelated to

13

those which cause him to need a cane, and some of these notes even contain references to [Plaintiff's] continued cane use." (Pl.'s Br. [Doc. #11] at 8.) In fact, even the ALJ admits that Plaintiff "was utilizing a cane for ambulation," as explicitly set out in the medical records on most occasions. (Tr. at 21) (citing Tr. at 815, 822, 837, 921, 969). The ALJ dismissed these instances of cane usage by noting that "the record reflects no evidence of pedal edema" (Tr. at 21), an incongruous explanation given that Plaintiff cited back problems, rather than any form of swelling, as the primary basis for his cane use and generally limited ambulation (See, e.g., Tr. at 921). Moreover, the ALJ cited only single instances in which Plaintiff "reported no feelings of instability" (Tr. at 21) (citing Tr. at 842) or exhibited normal postures (Tr. at 21) (citing Tr. at 822), and these records specifically note that Plaintiff was "ambulating with cane" with pain up to 10/10 (Tr. at 822). Similarly, although the ALJ provided half a dozen instances in which the treatment notes recorded no gross sensory or motor deficits (Tr. at 21) (citing Tr. at 334, 806, 815, 852, 893, 921), her reliance on this factor ignores extensive findings, often within the same note as the "normal" evidence, which show that Plaintiff's allegations of continued walking difficulties stem from chronic back pain and peripheral neuropathic symptoms, rather than gross neurological abnormalities. See Arakas v. Comm'r of Soc. Sec., 983 F.3d 83, 98-99 (4th Cir. 2024) ("In evaluating a disability claim, [a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (internal quotation omitted)). This "cherry-picking" and misconstruing of the evidence is reflected in several examples:

- The ALJ cites a medical record from January 2023 seven times (Tr. at 18, 20, 21, 22 (citing Tr. at 893)) for the proposition that Plaintiff "was ambulatory

14

without an assistive device" with "no sensory or motor deficits." However, it appears that this was a "telehealth" visit (Tr. at 890), and that same medical record reflects that it is "hard for [Plaintiff] to walk far" due to an L4 fracture, that he "use[s] a cane", and that he has "Abnormalities of Gait and Mobility" in that he "amb[ulates] w[ith] cane." (Tr. at 891, 894.)

• The ALJ cites a sequence of medical records from May 2023 six times for the proposition that Plaintiff had "no musculoskeletal deficits." (Tr. at 18, 20, 21, 22 (citing among Tr. at 802, 806, 812, 815, 852)). However, these records are for a series of urology visits, and even those include a notation that Plaintiff was "utilizing cane to assist with ambulation" and an evaluation of "ECOG 1" reflecting that Plaintiff was "restricted in strenuous activity". (Tr. at 815, 848.)

• The ALJ cites records from April 2022, October 2022, and February 2023 twice for the conclusion that Plaintiff was "ambulating without assistance and there was no evidence of gait disturbance." (Tr. at 21, citing Tr. at 860, 930, 1007). However, these are mental health medication management visits, listed as CVT telehealth (Tr. at 858, 929, 1006), and those same records also reflect that Plaintiff has "not been very active because of back and leg pains," (Tr. at 859). In addition, other records within the same week of each visit specifically note that he was "ambulating with cane[,]" was "very inactive walking with a cane" and "uses a cane to walk," and with "[u]nsteady gait or balance" and "[l]imited mobility." (Tr. at 841, 921, 1015).

In the context of Acquiescence Ruling 00-1(4) and Albright, the ALJ's explanation and the "cherry-picking" of the evidence prove particularly problematic. The RFC assessed by the prior ALJ limited Plaintiff to a very narrow range of light work, including, in pertinent part, a sit/stand option at will, multiple postural limitations, and the use of "a handheld device in his left hand for prolonged ambulation and for walking on uneven terrain." (Tr. at 87 (emphasis added).) None of the evidence cited by the ALJ in the present case explains why a cane would no longer be necessary in these particular situations. Even setting aside the concerns regarding cherry-picking among the records noted above, the need for a cane when walking for longer periods and/or distances or over uneven terrain would not necessarily be reflected in Plaintiff's

15

gait or his ability to walk in an exam room, nor would the other explanations cited by the ALJ apply.

Here, as the ALJ noted, significant time—approximately eight years—passed between Plaintiff's two administrative decisions. Because the majority of Plaintiff's disabling limitations stemmed from spinal injuries, including fractures of both the cervical and lumbar spine and herniated discs, some change in symptoms could be expected during that time. However, as noted above, Plaintiff's spinal injuries occurred in 2002 and still caused symptoms extensive enough to prove disabling in 2015. That period of disability continued until Plaintiff's incarceration in 2018. The medical records from the correctional institute further reflect that Plaintiff continued to be permitted a medically-approved cane for walking until his release in 2022, and was regularly observed using his cane during that time. (Tr. at 696, 634, 641, 665, 666, 668, 672, 676, 678, 682, 693.) Although there was no new, acute fracture between the prior 2015 decision and the present 2023 decision, the ALJ recognized Plaintiff's "history of cervical and lumbar spine fracture" as a severe impairment in the 2023 decision, as in the 2015 decision, but then failed to consider the medical evidence from that earlier period, or from the period of incarceration, and instead undertook a limited review that was cherry-picked, as noted above, and failed to support the significantly less restrictive RFC.

Most notably, the ALJ dismissed all of the available medical opinion evidence relating to Plaintiff's functioning from 2021 to 2023. As recounted by the ALJ, an ECOG performance scale, describing Plaintiff's level of functioning in terms of his ability to care for himself, perform daily activities, and perform physical activities, indicated that Plaintiff's was functioning at grade 1 in both February and May of 2023. Grade 1 "is defined as 'restricted

16

in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature.'" (Tr. at 20) (citing Tr. at 811, 848). Similarly, Michael Bergondo, a social worker with the Veterans' Administration, assessed Plaintiff's physical capabilities as falling in the light range with further "restrictions in bending, kneeling, lifting, standing, and walking." (Tr. at 20) (citing Tr. at 1015). Although the State agency medical consultants attempted to assess Plaintiff's abilities, they ultimately opined that there was insufficient evidence to render an opinion based on the evidence before them, and they were unable to reach Plaintiff, a homeless veteran,[6] for further information. (See Tr. at 20, 96, 107, 1014.)

The ALJ found all of the above opinions "unpersuasive," and specifically noted that "the record contains sufficient evidence to make a disability determination," despite the State agency consultants' finding to the contrary. (Tr. at 20.) For all three opinions, the ALJ provided nearly identical explanations for her determinations, noting that each opinion was "unpersuasive because it indicates that [Plaintiff] is more limited than determined in this decision." (Tr. at 20.) In this regard, the ALJ's apparent adoption of the RFC first and dismissal of all dissenting evidence "gets things backwards." See Mascio v. Colvin, 780 F.3d 632, 639 (4th Cir. 2015) (remanding where the ALJ "should have compared [the claimant's] alleged functional limitations from pain to the other evidence in the record, not to [his RFC]"). The RFC assessment must be based on the record as a whole, including testimony, objective testing, medical opinions, and all other available evidence, and the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189

---

[6] At the time of his hearing, Plaintiff noted that he was living in transitional housing for veterans. (Tr. at 17, 44-45.)

(4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). Here, the ALJ not only failed to build a "logical bridge" from the evidence to her conclusion, but also built the bridge in the wrong direction, starting with her conclusions and choosing to credit only the evidence supporting it. As such, her conclusions are not supported by substantial evidence as required by the Act.

Finally, the Court notes that, having dismissed all medical opinion evidence of Plaintiff's physical functioning, the ALJ was left with little but her lay opinion to decide the impact of Plaintiff's impairments on his functioning for the years at issue or to counter Plaintiff's subjective statements and the prior determination of disability. See Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529, 416.929 and remanding where the lack of medical support for the ALJ's conclusions "amount[ed] to the ALJ improperly 'playing doctor.'" (citation omitted)); see also Arakas, 983 F.3d at 108 ("[T]he ALJ improperly substituted his own opinion for Dr. Harper's. An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings."); Kee v. Berryhill, No. 1:15CV1039, 2017 WL 788306, at *6 and n.7 (M.D.N.C. Mar. 1, 2017) (remanding where Plaintiff's treating physicians were "the only medical sources to have opined on Plaintiff's condition after her second fusion surgery" and "the ALJ did not obtain the assistance of a medical expert to review the additional records"); Shaw v. Berryhill, No. 1:17CV91, 2018 WL 1322159, at *8 (M.D.N.C. Mar. 14, 2018) (remanding where "[t]he ALJ did not enlist the assistance of a medical expert to review the more recent evidence or provide an opinion regarding the extent of Plaintiff's mental impairments for the later period, and as a result, no medical professional has reviewed the records or provided an opinion for the time

period."). An ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). Development of the record may include ordering a consultative examination, and the regulations address the circumstances under which an ALJ may order such an examination, including where "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work, but the current severity of [the claimant's] impairment is not established." 20 C.F.R. §§ 404.1519a(b), 416.919a(b). See also Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980) (holding that remand is warranted for failure to develop the administrative record "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant"); Oakes v. Kijazaki, 70 F.4th 207, 213 (4th Cir. 2023) (noting that where the evidence in the record is incomplete or insufficient, the ALJ may obtain additional evidence as necessary, including obtaining a medical opinion or a consultative examination).

Because (1) the SSA previously found Plaintiff disabled based on the same impairment; (2) the reasons cited by the ALJ to discount that prior determination and to discount Plaintiff's allegations, particularly as to cane usage, prove significantly flawed, and (3) the ALJ found all medical opinion evidence assessing Plaintiff's physical limitations "unpersuasive," but then failed to obtain any medical review or consultative examination regarding Plaintiff's back

impairment, leaving the ALJ to formulate her own lay opinion, the Court cannot conclude that substantial evidence supports the ALJ's decision as written.  Accordingly, remand is required.[7]

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g).  To this extent, it is further ORDERED that Defendant's Dispositive Brief [Doc. #13] is DENIED, and Plaintiff's Dispositive Brief [Doc. #11] is GRANTED to the extent set forth herein.

This, the 31st day of March, 2026.

Joi Elizabeth Peake
United States Magistrate Judge

---

[7] The Court notes that similar issues may affect the evaluation of Plaintiff's mental impairments.  In this regard, the Court notes that the 2015 decision included as severe impairments Plaintiff's "affective disorders" and "personality disorders," and the 2023 decision likewise included Plaintiff's "bipolar disorder," but the prior 2015 decision included a myriad of limitations, including only occasional interaction with the public and coworkers," but the 2023 decision omitted any such limitations, without obtaining any psychiatric consultative examination or medical review.  The Court need not consider that issue further, as all of the claims are again before the ALJ on remand.

20